UNITED STATES of America, Appellee,

v.

STATE OF NEW HAMPSHIRE,
Defendant-Appellant.

No. 76–1018.

United States Court of Appeals,
First Circuit.

Argued April 17, 1976.

Decided Aug. 5, 1976.

Edward A. Haffer, Asst. Atty. Gen., Concord, N. H., with whom David H. Souter, Concord, N. H., was on brief, for defendant-appellant.

Herbert A. Goldsmith, Jr., Atty., Dept. of Justice, Washington, D. C., with whom J. Stanley Pottinger, Asst. Atty. Gen., Washington, D. C., William J. Deachman, III, U.

S. Atty., Concord, N. H. and David L. Rose, Atty., Dept. of Justice, Washington, D. C., were on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

On July 8, 1975, the United States brought suit against the State of New Hampshire to enforce compliance with the provisions of § 709(c) of Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–8(c) (1970 ed., Supp. IV), and the regulations of the Equal Employment Opportunity Commission (EEOC) published in 29 C.F.R. Part 1602. Specifically, the United States alleged that New Hampshire had failed to file acceptable "EEO–4" reports[1] for the calendar year 1973[2] and had failed to file any report for the calendar year 1974.

The State admitted each of the factual allegations in the complaint, but asserted as defenses that to the extent that the regulations in issue required the reporting of certain "race/ethnic group identifications," the regulations were not authorized by § 709(c); and that if § 709(c) did in fact authorize the imposition of such reporting requirements on the State of New Hampshire, then it was unconstitutional for various reasons. On December 22, 1975, the district court granted the motion of the United States for summary judgment, and this appeal followed. We are not persuaded by the State's arguments concerning either the scope or the constitutionality of § 709(c), and accordingly we affirm the judgment of the district court.

I

Section 709(c) of Title VII provides in pertinent part:

"Every employer . . . subject to this subchapter shall (1) make and keep such records relevant to the determinations of whether unlawful employment practices have been or are being committed, (2) preserve such records for such periods, and (3) make such reports therefrom as the Commission shall prescribe by regulation or order, after public hearing, as reasonable, necessary, or appropriate for the enforcement of this subchapter or the regulations or orders thereunder."

We must decide whether the EEOC regulations which mandate submission of the EEO–4 report are reasonable and are consistent with this statute from which they purportedly derive their authority. *See Commissioner of Internal Revenue v. South Texas Lumber Co.,* 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831 (1948).

Unquestionably Congress can delegate certain nonlegislative powers to those charged with administering statutory enactments. "[W]hen Congress [has] legislated and indicated its will, it [can] give to those who [are] to act under such general provisions 'power to fill up the details' by the establishment of administrative rules and regulations . . ." *United States v. Grimaud,* 220 U.S. 506, 517, 31 S.Ct. 480, 483, 55 L.Ed. 563 (1911), quoting *Wayman v. Southard,* 23 U.S. (10 Wheat.) 1, 43, 6 L.Ed. 253 (1825) (Marshall, C. J.). In our opinion, the challenged regulations represent a reasonable administrative effort "to fill up the details" which Title VII implied but did not specify. The information which the regulations require a state to furnish on the EEO–4 form is essentially raw statistical data which, properly interpreted, can provide an intelligent basis for determining whether the state may be guilty of an unlawful employment practice within the pur-

---

1. The EEO–4 report is a government form on which states and certain local governmental units are required to furnish the race, national origin, and sex of employees in various job categories. Regulations published by the EEOC, pursuant to § 709(c), mandate the annual filing of EEO–4 reports. 29 C.F.R. Part 1602.

2. The EEO–4 reports for 1973 were found unacceptable since the State did not indicate on them the race or national origin of its employees, but had simply inserted the word "American" in place of the various ethnic designations on the form.

view of Title VII. *See* 42 U.S.C. §§ 2000e–2 and 3.[3] Information like that which the EEO–4 form seeks to accumulate is often highly useful when an agency or court attempts to make the often difficult inference that illegal discrimination is or is not present in a particular factual context. As the Fifth Circuit has observed:

> " 'In the problem of racial discrimination, statistics often tell much, and Courts listen.' . . . Our wide experience with cases involving racial discrimination in education, employment, and other segments of society have [sic] led us to rely heavily in Title VII cases on the empirical data which show an employer's overall pattern of conduct in determining whether he has discriminated against particular individuals or a class as a whole." *Burns v. Thiokol Chemical Corp.*, 483 F.2d 300, 305 (5th Cir. 1973) (citations omitted), quoting *Alabama v. United States,* 304 F.2d 583, 586 (5th Cir.), *aff'd,* 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962).

*See also Castro v. Beecher,* 459 F.2d 725, 731 (1st Cir. 1972); *United States v. Ironworkers Local 86,* 443 F.2d 544, 551 (9th Cir.), *cert. denied,* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971). We have no doubt but that the information sought on the EEO–4 form is both reasonable and fully consistent with the overall purpose of Title VII, viz. "to achieve equality of employment opportunities and remove barriers that have operated in the past . . ."

*Griggs v. Duke Power Co.,* 401 U.S. 424, 429–30, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971).

■ The State argues that because the information gleaned from the EEO–4 reports *might* be misused in a relief program improperly relying on quotas[4] or in a program violative of § 703(j)[5] of Title VII, 42 U.S.C. § 2000e–2(j), the EEO–4 reporting requirement cannot be sustained. The short answer is however, that possible and purely hypothetical misuse of data does not require the banning of reasonable procedures to acquire such data. Statistical information as such is a rather neutral entity which only becomes meaningful when it is interpreted. And any positive steps which the United States might subsequently take as a result of its interpretation of the data in question remain subject to law and judicial scrutiny.

## II

■ The constitutional basis of § 709(c)— at least insofar as state and local governments are concerned—is the fifth section of the fourteenth amendment:

> "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

The Supreme Court has consistently held this section to mean that "Congress is authorized to *enforce* the prohibitions [of the fourteenth amendment] by appropriate legislation." *Ex Parte Virginia,* 100 U.S. 339,

---

**3.** In addition, this statistical data might properly be used by the Commission pursuant to its Congressional authorization "to make such technical studies as are appropriate to effectuate the purposes and policies of this subchapter and to make the results of such studies available to the public . . ." 42 U.S.C. § 2000e–4(g)(5).

**4.** The permissible scope of the use of quotas as a remedy in discrimination cases remains a delicate question. *Compare Boston Chapter N.A.A.C.P., Inc. v. Beecher,* 504 F.2d 1017, 1026–27 (1st Cir. 1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); *Associated General Contractors, Inc. v. Altshuler,* 490 F.2d 9, 18 (1st Cir. 1973), *cert. denied,* 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974); *Castro v. Beecher,* 459 F.2d 725, 732 (1st Cir. 1972) *with Chance v. Board of Examiners,* 534

F.2d 993, 44 U.S.L.W. 2343 (2d Cir. 1976); *Kirkland v. New York State Dep't of Correctional Services,* 520 F.2d 420, 427 & nn. 19–22 (2d Cir. 1975). *See also De Funis v. Odegaard,* 416 U.S. 312, 320, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (dissenting opinion of Douglas, J.); *Hughes v. Superior Court,* 339 U.S. 460, 467, 70 S.Ct. 718, 94 L.Ed. 985 (1950).

**5.** We have recently stated our understanding of the scope of § 703(j). Explicitly adopting the view of the majority in *Rios v. Enterprise Ass'n Steamfitters Local 638 of U.A.,* 501 F.2d 622 (2d Cir. 1974), we held that § 703(j) "deals only with those cases in which racial imbalance has come about completely without regard to the actions of the employer." *Boston Chapter N.A. A.C.P., Inc. v. Beecher, supra* at 1028.

345, 25 L.Ed. 667 (1880) (emphasis in original). *See also Katzenbach v. Morgan*, 384 U.S. 641, 648–51, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966). It is clear that when, by the Equal Employment Opportunity Act of 1972, Congress extended the coverage of Title VII to state and local government employees, that was an exercise of the power granted Congress by the fifth section of the fourteenth amendment. The House Report on the 1972 act explicitly states:

"The expansion of Title VII coverage to State and local government employment is firmly embodied in the principles of the Constitution of the United States. The Constitution has recognized that it is inimical to the democratic form of government to allow the existence of discrimination in those bureaucratic systems which most directly affect the daily interactions of this Nation's citizens. The clear intention of the Constitution, embodied in the Thirteenth and Fourteenth Amendments, is to prohibit all forms of discrimination.

"Legislation to implement this aspect of the Fourteenth Amendment is long overdue, and the committee believes that an appropriate remedy has been fashioned in the bill. Inclusion of state and local employees among those enjoying the protection of Title VII provides an alternate administrative remedy to the existing prohibition against discrimination perpetuated 'under color of state law' as embodied in the Civil Rights Act of 1871, 42 U.S.C. § 1983. . . ." H.R.Rep. No. 92–238, 92d Cong., 2d Sess. 19, U.S. Code Cong. & Admin.News 1972, pp. 2137, 2154.

Senator Javits, one of the managers of the 1972 bill in the Senate, also pointed to the fourteenth amendment as the ultimate source of the legislation's authority:

"[O]ne of the greatest reforms in this bill is its applicability to those who are engaged in State and local employment. . . . If anybody . . . is entitled to equal employment opportunity, it certainly is those people; and the only way they can get it, because the authority so far as they are concerned is the

State, is at the hands of the United States, under the 14th amendment. Section 5 of the 14th amendment, giving the power to Congress to enforce by appropriate legislation the provisions of this article, it seems to me, makes it mandatory not discretionary, . . . that we act affirmatively on this aspect of this bill." 118 Cong.Rec. 1840 (1972).

*See also Fitzpatrick v. Bitzer*, —— U.S. ——, 96 S.Ct. 2666, 49 L.Ed.2d —— & n.9 (1976); *United States v. City of Milwaukee*, 395 F.Supp. 725, 727–28 (E.D.Wis.1975).

Given this plain reliance by Congress on the fourteenth amendment, we need not pause for long to inquire whether § 709(c) constitutes "appropriate legislation" for the enforcement of the provisions of that amendment. Title VII was enacted "to assure equality of employment opportunities by eliminating those practices and devices that discriminate on the basis of race, color, religion, sex, or national origin." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974) (citations omitted). In our view, when Congress extended these assurances to state and local government employees in 1972, it was simply enforcing the guarantee of "the equal protection of the laws" accorded by the first section of the fourteenth amendment. *See Fitzpatrick v. Bitzer, supra*, 96 S.Ct. at 2670, 44 U.S.L.W. at 5123. And, as the challenged record keeping and reporting provision, § 709(c), is a reasonable and proper means of assuring equality in employment, *see* Part I *supra*, it too would be authorized by the fifth section of the fourteenth amendment.

■ The State also argues vigorously that § 709(c) is an invalid exercise of Congressional power under the commerce clause (Art. I, § 8). This argument is beside the point, however because Congress principally relied on the fourteenth amendment when in 1972 it included states within the purview of Title VII. "While Congress had to draw its power from the commerce clause in order to regulate 'private' employers, the enabling clause of the Fourteenth

Amendment specifically enables Congress to enforce the Fourteenth Amendment by 'appropriate legislation.' Therefore, since state and local government employers are subject to the Fourteenth Amendment, Congress has the power to regulate these entities by appropriate legislation independent from any affect [sic] upon interstate commerce." *United States v. City of Milwaukee, supra* at 728. *See also Fitzpatrick v. Bitzer, supra,* 96 S.Ct. 2666, 44 U.S.L.W. at 5122 & n.9. New Hampshire of course lacks standing to contest whether any given private employer is properly included within the scope of Title VII[6].

In sum, we hold that the State's constitutional objections to § 709(c) must be rejected as failing to give sufficient weight to the very broad enforcement power which the fifth section of the fourteenth amendment accords to Congress.

### III

 Finally, the State claims that the district court erred in awarding costs in favor of the United States. It is true, as the State points out, the Title VII does not explicitly provide for the awarding of costs when the United States is the prevailing party, but neither does it prohibit such an award. Under these circumstances and in the light of our extensive discussion in *Boston Chapter, N.A.A.C.P., Inc. v. Beecher,* 504 F.2d 1017, 1028–29 (1st Cir. 1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975), the court did not err in awarding costs to the United States.

Affirmed.

---

6. The State has also raised several less weighty objections to the validity of § 709(c). We have examined each of these objections, but find none of them persuasive or deserving of discussion.